**WO**

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF ARIZONA

Southwest Fair Housing Council,

Plaintiff,

v.

WG Campana del Rio SH LLC,

Defendant.

No. CV-19-00179-TUC-RM

**ORDER**

Plaintiff Southwest Fair Housing Council ("Southwest" or "Plaintiff" ) brought this action pursuant to the Americans with Disabilities Act ("ADA"), Section 504 of the Rehabilitation Act ("Section 504" or "the Rehabilitation Act"), the Affordable Care Act ("ACA"), the Fair Housing Act ("FHA") and the Arizona Fair Housing Act ("AZFHA"). Plaintiff filed a Motion for Summary Judgment (Doc. 47), to which Defendant responded in opposition (Doc. 50). Defendant WG Campana del Rio SH LLC ("WG Campana" or "Defendant") also filed a Motion for Summary Judgment (Doc. 45), to which Plaintiff responded in opposition (Doc. 52). The Motions will be granted in part and denied in part as follows.

## I.    Summary Judgment Standard

A court must grant summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986). The

movant bears the initial responsibility of presenting the basis for its motion and identifying those portions of the record, together with affidavits, if any, that it believes demonstrate the absence of a genuine issue of material fact. *Celotex*, 477 U.S. at 323.

If the movant fails to carry its initial burden of production, the nonmovant need not produce anything. *Nissan Fire & Marine Ins. Co. v. Fritz Co.*, 210 F.3d 1099, 1102–03 (9th Cir. 2000). But if the movant meets its initial responsibility, the burden shifts to the nonmovant to demonstrate the existence of a factual dispute and to show (1) that the fact in contention is material, i.e., a fact that might affect the outcome of the suit under the governing law, and (2) that the dispute is genuine, i.e., the evidence is such that a reasonable jury could return a verdict for the nonmovant. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 250 (1986); *see Triton Energy Corp. v. Square D. Co.*, 68 F.3d 1216, 1221 (9th Cir. 1995). The nonmovant need not establish a material issue of fact conclusively in its favor, *First Nat'l Bank of Ariz. v. Cities Serv. Co.*, 391 U.S. 253, 288–89 (1968); however, it must "come forward with specific facts showing that there is a genuine issue for trial." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (internal citation omitted); *see* Fed. R. Civ. P. 56(c)(1).

At summary judgment, the Court's function is not to weigh the evidence and determine the truth but to determine whether there is a genuine issue for trial. *Anderson*, 477 U.S. at 249. Pure questions of law, where there is no disputed issue of fact, are appropriate for summary judgment. *Schrader v. Idaho Dep't of Health & Welfare*, 768 F.2d 1107, 1110 (9th Cir. 1985). "The inquiry performed is the threshold inquiry of determining whether there is the need for a trial—whether, in other words, there are any genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party." *Anderson*, 477 U.S. at 250. "[T]his standard mirrors the standard for a directed verdict under Federal Rule of Civil Procedure 50(a), which is that the trial judge must direct a verdict if, under the governing law, there can be but one reasonable conclusion as to the verdict." *Id.* (internal citation omitted). In its analysis, the Court must accept the nonmovant's evidence and draw all inferences in the nonmovant's

favor. *Id.* at 255. The Court need consider only the cited materials, but it may consider any other materials in the record. Fed. R. Civ. P. 56(c)(3).

## II. Factual Background

Plaintiff Southwest Fair Housing Council brought this action against Defendant WG Campana seeking remedies for unlawful discrimination based on disability. (Doc. 47 at 1.) Plaintiff is a non-profit organization based in Tucson, Arizona that seeks to ensure that all people, including deaf individuals, have equal access to housing in Arizona. (*Id.*) Plaintiff employed testers to investigate Defendant's willingness to provide auxiliary aids and services at its facilities, including American Sign Language ("ASL") interpreters, as part of its mission to alleviate disability discrimination in housing. (*Id.*)

Defendant WG Campana is a 254-unit residential apartment complex located in Tucson, Arizona that provides private apartments for active seniors. (Doc. 45 at 2.) Amenities provided to residents include linen service, housekeeping, a common dining area, local transportation, and 24-hour staff. (*Id.*) As a licensed assisted living community, WG Campana is authorized to provide 84 residents with personal care services, and up to 16 residents with directed care services. (*Id.*) Residents receiving personal care services may receive assistance with bathing or getting dressed, and escort to and from meals or events. (*Id.*) WG Campana's directed care services are limited to the memory care services it provides, which include a secure environment, heightened monitoring, and assistance with daily living activities such as bathing and grooming. (*Id.*) WG Campana does not provide healthcare, medical care, or skilled nursing services. (*Id.*)

On June 22, 2016, Plaintiff's tester Nermana Pehlic, formerly known as Nermana Hasancevic ("Hasancevic"), visited Defendant's assisted living facility on behalf of her deaf grandmother, who was a fictional character created for testing purposes. (Doc. 45 at 3.) Each contact or communication between Plaintiff's testers and Defendant's employees that is at issue in this lawsuit was either audio or video recorded or memorialized in an email message. (*See* Doc. 46 at ¶ 47.) The facts and circumstances of Plaintiff's testers' contacts with Defendants' employees are set forth below.

1          During Hasancevic's June 22, 2016 tour with Defendant's Community Sales
2   Director Clause Ommegard ("Ommegard"), Hasancevic discussed details about her
3   grandmother, including her activity level, her interests, and that she was deaf. (*Id*. at 3.)
4   During the tour, Hasancevic asked Ommegard "how [activities at the facility] would work
5   if . . . she does, you know, sign language?" (*Id*.; Doc. 48-10.) Hasancevic asked Ommegard,
6   "does the facility provide a translator?" (Doc. 48-10.) Ommegard responded that Defendant
7   did not have a translator on staff and that he did not know whether the facility had staff that
8   could sign. (*Id*.) Ommegard stated that other residents "kind of figured out . . . they carried
9   like . . . a little notepad" and were "kind of wanting to figure things out." (*Id*.) When
10  Hasancevic asked about "stuff like medical," Ommegard responded that she "might have
11  to talk to the doctor" and "might have to check to see what resources" were available on a
12  "state level" or "federal level." (*Id*.) Ommegard then stated that "the communities typically
13  don't," and "not that I've seen in any of the communities," apparently to say that none of
14  the Atria communities he had worked at provided interpreters for any of their deaf
15  residents. (*Id*.) Hasancevic then asked if "that would be something that she would have to
16  look into on her own?" and Ommegard replied affirmatively. (*Id*.)

17         On December 21, 2016, Plaintiff tester Maggie Johnson ("Johnson") emailed
18  Defendant's employee in an apparent follow up message to the June 22, 2016 visit. (Doc.
19  48-9.) In that email exchange, Johnson stated that her grandmother "is deaf and uses ASL,"
20  that "she doesn't need an interpreter 24 hours or all the time," but would "need help with
21  medical discussions or when she's admitted, group activities, or other vital or important
22  communications." (*Id*.) In response, Defendant's employee Hope Guevara ("Guevara")
23  wrote, "We have had deaf residents live here before and get along just fine. Many write
24  notes as to what their needs are so we can communicate. . . her deafness should not be an
25  issue as long as she can jot down her needs. We are also checking to see if the home health
26  agency that is onsite, Sunlife, has any caregivers that sign. . . there would be an extra cost
27  for those services." (*Id*.) Prior to sending this message, Guevara unsuccessfully attempted
28  to contact the testers by phone. (Doc. 51 at ¶ 15.)

After receiving no response, Guevara sent Hasancevic and Johnson a second email message, in which she stated, "We understand she is deaf and communicating is important. We do not have anyone on staff that signs, however, we do have residents in a similar situation [] and we are able to communicate with them well enough. [She] can jot down notes and vice versa. There are also special doorbells that can be installed. . . [We] would love to work with you and your family if we are [a] good choice." (Doc. 48-11.)

### III.   Discussion

Defendant moves for summary judgment on three grounds. (Doc. 45.) First, Defendant argues that Plaintiff sustained no injury in fact and thus lacks standing to bring its claims. (*Id*. at 5.) Second, Defendant argues that it receives no federal funding, and thus is exempt from the requirements of the Rehabilitation Act and the ACA. (*Id*. at 7.) Third, Defendant argues that Plaintiff has provided insufficient evidence of discrimination under the FHA, the ADA, the Rehabilitation Act, and the ACA. (*Id*. at 8.) In support of its final argument, Plaintiff argues that there is no evidence supporting a finding that (1) Defendant denied Plaintiff an interpreter; (2) an interpreter was necessary in order to facilitate effective communication between Plaintiff and Defendant; (3) Defendant failed to make a proper individualized inquiry into whether specific accommodations were reasonable and necessary; or (4) Defendant denied Plaintiff a reasonable and effective accommodation. (*Id*. at 12-14.)

Plaintiff separately moves for summary judgment on each of its four claims. (Doc. 47.) Plaintiff argues that the Court should grant summary judgment on its ADA claim because Defendant failed to make reasonable and necessary modifications or accommodations that would have provided Plaintiff equal accessibility to Defendant's facility and services. (*Id*. at 4.) Plaintiff argues that Defendant failed to offer a reasonable accommodation by (1) offering only note writing as a means of communication and (2) categorically denying Plaintiff's request for a reasonable accommodation. (*Id*. at 5-8.) Plaintiff further argues that Defendant has not shown that an undue burden would prevent it from providing the requested reasonable accommodation. (*Id*. at 8.) Plaintiff makes

1    analogous arguments with respect to its ACA and Rehabilitation Act claims. (*Id*. at 10-13.)

2    Finally, Plaintiff argues that the Court should grant summary judgment on its FHA claims

3    because Plaintiff has shown that (1) the requested interpreter was a reasonable and

4    necessary accommodation and (2) Defendant failed to engage in the required interactive

5    process. (*Id*. at 16.)

6                              **A.    Standing**

7           Defendant WG Campana moves for summary judgment based upon Plaintiff

8    Southwest's alleged lack of standing to bring its claims. (Doc. 45 at 5.) Defendant argues

9    that Plaintiff suffered no injury in fact because, as an organizational plaintiff, it did not

10   expend or divert any resources to redress Defendant's alleged discriminatory practices that

11   it would not have expended in its normal course of business. (*Id*. at 5-6.) Specifically,

12   Defendant argues that Plaintiff expended resources only on testing the WG Campana

13   facility for legal compliance and that Plaintiff did not conduct any other activities or take

14   any other actions, such as creating educational programs or awareness campaigns, in

15   response to the alleged discrimination. (*Id*. at 7.) Plaintiff argues that it satisfies the Article

16   III injury requirements for organizational standing because it can demonstrate (1)

17   frustration of its organizational mission and (2) diversion of its resources to combat the

18   particular housing discrimination in question. (Doc. 47 at 3; Doc. 52 at 2-4.)[1]

19          Fair housing organizations such as Plaintiff have standing to bring civil lawsuits for

20   discrimination uncovered by their testers. *Havens Realty Corp. v. Coleman*, 455 U.S. 363,

21   373-4 (1982). To demonstrate standing under Article III, an organizational plaintiff must

22   suffer an "injury in fact," which can consist of a tester suffering the harm intended to be

23   prevented by an anti-discrimination statute. *See id*. at 373-5.

24          Where an organization's resources are diverted to "investigating and other efforts

25   to counteract discrimination," the injury is sufficient to establish standing. *Fair Hous. of*

26   *Marin v. Combs*, 285 F.3d 899, 905 (9th Cir. 2002). An organization must show that it

27

28   [1]  Defendant contests only Plaintiff's satisfaction of the "diversion of resources" requirement (Doc. 45 at 5-7); therefore the Court will focus its standing analysis on that issue.

suffered a "concrete and demonstrable injury to [its] activities—with the consequent drain on the organization's resources—[that] constitute[d] far more than simply a setback to the organization's abstract social interests." *Havens Realty Corp*. at 379. However, "litigation expenses alone do not establish standing." *Fair Hous. of Marin* at 905. The Ninth Circuit has recently clarified that an organization may not simply go about its "business as usual" but must "alter its resource allocation to combat the challenged practices." *Am. Diabetes Ass'n v. United States Dep't of the Army*, 938 F.3d 1147, 1154 (9th Cir. 2019). Examples of alterations to resource allocation that courts have found adequate to establish standing include: creating educational and outreach initiatives, expending resources to address the alleged violation that would have otherwise gone toward some other aspect of the organization's purpose, and monitoring the alleged violations and educating the public about them. *See id*. at 1154-55; *see also Fair Hous. of Marin* at 904 (listing cases where organizations had standing to bring discrimination claims due to diversion of resources); *Walker v. City of Lakewood*, 272 F.3d 1114, 1124 (9th Cir. 2001) (diversion of staff time is a loss for which a fair housing organizational plaintiff may recover damages).

Plaintiff claims that its damages related to diversion of resources amount to $3,428.00 and damages related to frustration of mission amount to $520,000. (PSOF at ¶ 29.) Plaintiff's documentation of its expenses in connection with this action reflects Plaintiff's activities related to its investigation of WG Campana as well as at least two other housing facilities. (*See* Doc. 48-1, Exh. A to PSOF.)

Plaintiff asserts that it "diverted staff time away from other projects to develop and analyze the 2016 tests." (*Id*. PCSOF at ¶ 89; *see* Exh. O to PCSOF at 7:16-8:11, 90:5-18; Exh. P to PCSOF at 72:25-73:15; 104:3-23; Exh. Q to PCSOF.) Plaintiff asserts that its employee, Erika Hardwick, "was unable to spend adequate time analyzing other investigations due to Plaintiff's investigation of Defendant." (*Id*. at ¶ 90; Exh. O to PCSOF at 7:15-8:11; 42:24-43:17.) Plaintiff asserts that it reallocated grant money to fund its investigation of Defendant. (*Id*. at ¶ 91; *see* Exh. O to PCSOF at 39:10-23, 40:7-45:7; Exh. P to PCSOF at 104:3-23.) Plaintiff asserts that it "undertook post-investigation outreach

and education efforts, including a newsletter, to inform the deaf community and other stakeholders of their rights." (*Id*. at ¶ 92; Doc. 48-1, Exh. A to PSOF; Exh. P to PCSOF at 21:13-22:3, 71:17-72:11, 91:1-3; Exh. Q to PCSOF). Plaintiff asserts that it "trained its 2016 testers, paid its testers for carrying out the tests, and paid for associated costs related to the tests, such as travel expenses." (*Id*. at ¶ 93; Doc. 48-1, Exh. A to PSOF; Exh. O to PCSOF at 58:1-17, 87:24-88:12; Exh. Q to PCSOF.)

Southwest points to deposition testimony from its employees Erika Hardwick (Doc. 53-4, Exh. O to PCSOF) and Jay Young (Doc. 53-5, Exh. P to PCSOF) to support its claim to standing. Ms. Hardwick testified that she had to begin billing her work regarding Southwest's testing and investigation of Defendant's alleged discrimination to a specific grant, rather than attributing it to a general funding source, because she was "expending so much time and energy doing it" that she "wasn't doing [her] other stuff." (Doc. 53-4 at 9.) Ms. Hardwick further testified that, due to the time she spent investigating Defendant and responding to the violations alleged in this action, she was unable to spend as much time as she otherwise would have on a project to undertake investigation of discriminatory practices in Arizona mobile home parks. (*Id*. at 12-13.)

In response to a question about whether Southwest diverted funds from another program to address the issues raised in this case, Jay Young testified that "when something like this comes up . . . it requires us to refocus our efforts . . . to address that particular issue, as opposed to other issues that we may have identified . . . . [I]t does take resources away from other activities and other issues that we had planned on dealing with." (Doc. 53-5 at 8-9.) Mr. Young further testified that he directed the staff members responsible for conducting Southwest's education and outreach programs to "figure out how to best provide education and outreach to the population that is identified in the claim" and "that's what they did." (*Id*. at 10.) Mr. Young further testified that the "resources that [Plaintiff] used to deal with this particular issue were resources that would have been used to deal with other fair housing issues that we had discovered or were aware of, or . . . wanted to investigate or look into . . . [T]his investigation and all of the things have gone into it have

1  been a pretty dramatic diversion of our resources in a way that has really required staff to

2  refocus and do things that they weren't anticipating."

3      The deposition testimony of Ms. Hardwick and Mr. Young establishes that Plaintiff

4  diverted resources, including staff time and organizational funding, to address Defendant's

5  alleged discriminatory practices. (Doc. 53-4 at 9, 12-13; (Doc. 53-5 at 8-9.) This testimony

6  is sufficient to establish "diversion of resources" for the purpose of organizational standing.

7  Accordingly, Defendant's Motion for Summary Judgment will be denied on the issue of

8  standing, and Plaintiff's Motion will be granted on that issue.

9      **B.    Rehabilitation Act and ACA Claims**

10      In support of its Motion for Summary Judgment on the Rehabilitation Act and ACA

11  claims, Defendant argues that it does not receive federal financial assistance and that

12  Plaintiff has failed to establish the federal funding nexus required to establish Defendant's

13  liability pursuant to Section 504 of the Rehabilitation Act and the ACA. (Doc. 45 at 7.)

14      The Rehabilitation Act provides that "[n]o otherwise qualified individual with a

15  disability . . . shall, solely by reason of her or his disability, be excluded from the

16  participation in, be denied the benefits of, or be subjected to discrimination under any

17  program or activity receiving Federal financial assistance." 29 U.S.C. § 794(a). The statute

18  defines "program or activity," in relevant part, as "all of the operations of" "an entire

19  corporation . . . or other private organization . . . (i) if assistance is extended to such

20  corporation [or] private organization [] as a whole; or (ii) which is principally engaged in

21  the business of providing [] health care, housing, [or] social services[.]"  29 U.S.C. §

22  794(b)(3).

23      The ACA provides that "an individual shall not, on the ground prohibited by . . .

24  section 794 of Title 29 [the Rehabilitation Act], be excluded from participation in, be

25  denied the benefits of, or be subjected to discrimination under, any health program or

26  activity, any part of which is receiving Federal financial assistance, including credits,

27  subsidies, or contracts of insurance[.]" 42 U.S.C. § 18116. "[P]ayments that include a

28

subsidy constitute 'Federal financial assistance' within the meaning of the Rehabilitation Act." *Jacobson v. Delta Airlines, Inc.*, 742 F.2d 1202, 1209 (9th Cir. 1984).

The scope of Section 504 is limited to those who "actually receive federal financial assistance." *U.S. Dep't of Transp. v. Paralyzed Veterans of Am.*, 477 U.S. 597, 605 (1986). Congress intended that a program or operation may avoid the non-discrimination requirements of the Rehabilitation Act (or other federal anti-discrimination statutes) by opting out of receiving federal funding. *Id.* at 505-6. Entities that merely benefit from federal funding, without actually receiving it, are not subject to the Rehabilitation Act. *Id.* at 606-7; *see also Castle v. Eurofresh, Inc.*, 731 F.3d 901, 908-9 (9th Cir. 2013). However, there is no statutory basis for a distinction between direct and indirect aid; in other words, institutions that themselves have not applied for or directly received federal funding may still be subject to non-discrimination requirements if they receive federal funds from an intermediary or third party. *See Grove City College v. Bell*, 465 U.S. 555, 563-63 (1984) (college that received federal funds from individual students was considered a recipient of federal funding although it did not directly receive federal financial assistance). Thus, a hospital's receipt of Medicare and Medicaid funds from patients can subject the hospital to Section 504 of the Rehabilitation Act. *United States v. Baylor University Medical Center*, 736 F.2d 1039, 1042-43 (5th Cir. 1984).

Plaintiff alleges in its SAC that Defendant qualifies as "a program or activity" receiving federal financial assistance pursuant to 29 U.S.C. § 794(b) because Defendant receives funding from Medicare and/or Medicaid; the SAC does not allege that Defendant receives federal funding in the form of veterans' pensions or benefits. (Doc. 18 at ¶¶15, 35; *see also* Doc. 45 at 8.) Defendant has presented evidence showing that it does not receive funding from Medicare and/or Medicaid. (Doc. 50 at 5; *see also* Doc. 18, ¶¶ 15 and 35; DCSOF at ¶ 44, Doc. 51 at 8). Plaintiff has not provided any controverting evidence. Therefore, the Court concludes that there is no evidence to support a finding that Defendant receives federal funding in the form of Medicare and/or Medicaid.

1      In its summary judgment briefing, Plaintiff relies on the contents of an informational

2    pamphlet and a public website to argue that Defendant, through its parent company Atria

3    Senior Living ("Atria"), is a recipient of federal funding via the Veterans Affairs Aid and

4    Attendance ("A&A") Pension. (Doc. 52 at 5-6; Doc. 54 at 3-4.) According to Atria's

5    website, "many" of its residents are "using this pension" to pay for services in Atria

6    communities. (Doc. 54 at 4.)[2] The Court assumes, without deciding, that Atria's receipt of

7    federal funding in the form of payments from veterans' benefits programs is sufficient to

8    establish a federal funding nexus on behalf of WG Campana. *See Bonner v. Arizona Dep't

9    of Corr.*, 714 F. Supp. 420, 422-23 (D. Ariz. 1989); 29 U.S.C. § 794(b)(3). The Court

10   further finds that Plaintiff has presented some evidence of Atria's, and thus WG

11   Campana's, receipt of federal funding in the form of veterans' benefits.

12     An issue remains as to whether Plaintiff timely disclosed its theory of Defendant's

13   federal financial assistance and, if it did not, whether it may do so now. Defendant argues

14   that Plaintiff failed to fulfill its obligation to disclose its federal funding legal theory and

15   the evidence supporting it prior to the close of discovery, and that its failure to do so bars

16   it from raising the theory or evidence at the summary judgment stage. (Doc. 50 at 4-6.)

17   Defendant states that discovery closed on February 28, 2020 and that Plaintiff's

18   Supplemental Responses to Mandatory Discovery Responses served on that date do not

19   mention the Department of Veterans Affairs ("VA") or Defendant's alleged receipt of

20   funds from the VA, or any theory that receipt of such funds would qualify defendant as a

21   covered entity under the Rehabilitation Act or the ACA. (Doc. 50 at 5; *see also* DCSOF at

22   ¶ 27, Doc. 51 at 6.) Defendant contends that Plaintiff did not disclose the theory that

23   Defendant receives federal funds in the form of veterans' pensions or benefits until March

24   5, 2020, a week after discovery closed. (*Id*.; *see also* Doc. 33; Doc. 51-2.)

25     In response, Plaintiff contends that its allegation in the SAC that Defendant received

26   federal funds in the form of Medicare and/or Medicaid was sufficient to timely raise the

---

28   [2]    *See also* Atria Senior Living, Veterans Benefits, https://www.atriaseniorliving.com/family-resources/financial-planning/veterans-benefits/ (accessed Oct. 26, 2020).

theory that Defendant receives federal funds from veterans' pensions and/or benefits. (Doc. 54 at 4.) Plaintiff further contends that it raised the VA funding theory in its response to an interrogatory that was disclosed five days after the close of discovery but that even if this is a late disclosure, it did not prejudice Defendant and should therefore be permitted. (*Id.*)

Allowing a plaintiff to proceed with a new theory of recovery after the close of discovery prejudices a defendant and is not permitted because a "lack of notice" on an "issue central to the cause of action makes it difficult, if not impossible, for [a defendant] to know how to defend itself." *Coleman v. Quaker Oats Co.*, 232 F.3d 1271, 1292 (9th Cir. 2000). "A complaint guides the parties' discovery, putting the defendant on notice of the evidence it needs to adduce in order to defend against the plaintiff's allegations." *Id.* "A defendant suffers prejudice if a plaintiff is allowed to proceed with a new theory of recovery after close of discovery." *Smith v. City & Cty. of Honolulu*, 887 F.3d 944, 951–52 (9th Cir. 2018) (internal citation omitted). "It is well settled in the Ninth Circuit that parties generally cannot assert unpled theories for the first time at the summary judgment stage." *Bullard v. Wastequip Mfg. Co. LLC*, 2015 WL 12766467 at *10 (C.D. Cal. April 14, 2015); *see also Navajo Nation v. United States Forest Serv.*, 535 F.3d 1058, 1080 (9th Cir. 2008) ("[O]ur precedents make clear that where, as here, the complaint does not include the necessary factual allegations to state a claim, raising such claim in a summary judgment motion is insufficient to present the claim to the district court.") A plaintiff "can avoid this bar by showing that defendants had sufficient notice of [the legal theory] prior to the close of discovery, either through the pleadings or otherwise, or by demonstrating that the court should allow an amendment of the complaint to permit him to assert the new theory at the summary judgment stage." *Bullard*, 2015 WL 12766467 at *10 (citing *Coleman*, 232 F.3d at 1291).

The parties in this case were required to comply with the Mandatory Initial Discovery Pilot Project ("MIDP"), which required them, inter alia, to state facts relevant to and legal theories supporting each claim or defense during discovery. *See* General Order 17-08, Section B(4). Likewise, the Federal Rules of Civil Procedure require a party to

disclose witnesses, documents, and other sources of information that may support a claim or defense. *See* Fed. R. Civ. P. 26(a)(1).

Plaintiff's argument amounts to an assertion that its allegation that Defendant received VA funding is not a new theory of recovery, because the SAC alleges that Defendant receives federal funds and therefore Defendant had notice of the theory. (Doc. 54 at 4.) Plaintiff also argues that Defendant has suffered no prejudice. (*Id*.) However, late disclosure of theories of recovery is presumptively prejudicial, *see Smith*, 887 F.3d at 951–52, and Plaintiff has not provided sufficient evidence or argument to overcome this bar.

Like the defendants in *Coleman*, due to Plaintiff's failure to disclose this theory before the close of discovery, Defendant had no opportunity to prepare a defense to the allegation that it receives federal financial assistance in the form of VA funds. Beyond Plaintiff's conclusory assertion that it raised the issue in the SAC, Plaintiff does not explain why the alleged VA funding is not a new theory of recovery. The SAC indisputably fails to allege that Defendant or Atria receives VA funding, and Plaintiff's late disclosure of this theory violates the MIDP Rules and Fed. R. Civ. P. 26(a)(1).

Receipt of federal funds is an essential element of a defendant's liability pursuant to the Rehabilitation Act and the ACA. Discovery on the issue would have permitted both parties an opportunity to obtain the evidence needed to prove, or disprove, this element at trial. Not to allow Defendant an opportunity during discovery to address the allegation that it receives VA funding prejudices Defendant, *see Smith*, 887 F.3d at 951–52, and therefore Plaintiff cannot proceed with this theory. Because Plaintiff is precluded from pursuing its theory that Defendant received federal financial assistance in the form of veterans' benefits and Plaintiff has failed to identify any other evidence of Defendant's receipt of federal funding, summary judgment on the Rehabilitation Act and ACA claims will be granted to Defendant.

## C.    ADA Claims

Title III of the ADA prohibits discrimination based on disability by places of public accommodation. 42 U.S.C. § 12182(a). Title III provides that "No individual shall be

discriminated against on the basis of disability in the full and equal enjoyment of the goods, services, facilities, privileges, advantages, or accommodations of any place of public accommodation by any person who owns, leases (or leases to), or operates a place of public accommodation." *Id*. Title III further provides that "[i]t shall be discriminatory to exclude or otherwise deny equal goods, services, facilities, privileges, advantages, accommodations, or other opportunities to an individual or entity because of the known disability of an individual with whom the individual or entity is known to have a relationship or association." 42 U.S.C. § 12182(b)(1)(E).

Federal regulations implementing Title III of the ADA provide that a public entity "shall furnish appropriate auxiliary aids and services where necessary to ensure effective communication with individuals with disabilities." 28 C.F.R. § 36.303(c). The regulations further provide that a public entity "shall take those steps that may be necessary to ensure that no individual with a disability is excluded, denied services, segregated or otherwise treated differently than other individuals because of the absence of auxiliary aids and services." 28 C.F.R. § 36.303(a).

The SAC alleges that Defendant violated Title III of the ADA, 42 U.S.C. § 12181, by discriminating based on disability by denying effective communication, full and equal enjoyment, and a meaningful opportunity to participate in and benefit from Defendant's residential and health care services. (Doc. 18 at ¶ 7.) These allegations stem from Plaintiff's testing of Defendant's facility using a fictional deaf relative, which Plaintiff argues resulted in a refusal by Defendant to provide a reasonable accommodation to ensure effective communication by denying requests for an American Sign Language ("ASL") interpreter. (Doc. 47 at 2.)

### i.    Applicable Law

Title III of the ADA defines discrimination as the failure to make reasonable modifications in policies, practices, or procedures, when such modifications are necessary to afford such goods, services, facilities, privileges, advantages, or accommodations to individuals with disabilities, unless the entity can demonstrate that making such

modifications would fundamentally alter the nature of such goods, services, facilities, privileges, advantages, or accommodations. 42 U.S.C. § 12182(b)(2)(A)(ii); *Martin v. PGA Tour*, 532 U.S. 661 (2001). Plaintiff argues that Defendant failed to furnish appropriate accommodations—in this case, an ASL interpreter—to deaf persons as required by law.

For Plaintiff to prevail on summary judgment on its ADA claim, Plaintiff must show that no genuine dispute of material facts exists and that, as a matter of law: (1) Plaintiff is a disabled individual under the statute; (2) Defendant is a place of public accommodation; and (3) Defendant discriminated against Plaintiff by denying a full and equal opportunity to enjoy the services Defendant provides. *Arizona ex rel. Goddard v. Harkins Amusement Enterprises, Inc.*, 603 F.3d 666, 670 (9th Cir. 2010). As to the first element, Defendant disputes Plaintiff's standing to bring this action and appears to argue that a "fictional deaf relative" cannot provide a basis for standing. (*See* Doc. 50 at 6.) However, as discussed above in Section II, Plaintiff has established the elements necessary for standing and therefore the first element is satisfied.[3] Defendant does not dispute the second element, that it is a place of public accommodation. (*See* Docs. 45, 50.) Thus, the dispute centers on the third element—whether there are genuinely disputed facts as to whether Defendant denied Plaintiff, via its testers, a full and equal opportunity to enjoy Defendant's services by refusing to provide an ASL interpreter. (*See id.*); *see Durand v. Fairview Health Servs.*, 902 F.3d 836, 842 (8th Cir. 2018).

The Department of Justice ("DOJ") has issued implementing regulations for Title III of the ADA as well as Technical Assistance ("TA") Manuals. *See* 28 C.F.R. 36.101 *et seq.* An agency's interpretation of its own regulations is controlling unless it is "plainly erroneous or inconsistent with the regulation." *Auer v. Robbins*, 519 U.S. 452, 461 (1997) (internal citation omitted). Thus, "[t]he [Department of Justice's] interpretation of its ADA implementing regulations is entitled to controlling weight unless it is plainly erroneous or

---

[3] Deafness is generally considered a disability within the meaning of the ADA and Defendant has not argued otherwise. *See Bates v. United Parcel Serv., Inc.*, 511 F.3d 974, 988 (9th Cir. 2007) ("There is no dispute that the class members, who are hearing impaired, are disabled."); *Duffy v. Riveland*, 98 F.3d 447, 454-5 (9th Cir. 1996) (deaf inmate considered "handicapped" within meaning of ADA).

- 15 -

1    inconsistent with the regulation." *Fortyune v. City of Lomita*, 766 F.3d 1098, 1104 (9th Cir.

2    2014) (internal citation and quotation omitted). "The [TA] Manual is such an interpretation,

3    and, as such, is entitled to significant weight as to the meaning of the regulations." *Id.*

4    (internal citation and quotation omitted).

5            The regulations state that "a public accommodation should consult with individuals

6    with disabilities whenever possible to determine what type of auxiliary aid is needed to

7    ensure effective communication, but the ultimate decision as to what measures to take rests

8    with the public accommodation, provided that the method chosen results in effective

9    communication." 28 C.F.R. § 36.303(c)(1)(ii). "A public accommodation shall not require

10   an individual with a disability to bring another individual to interpret for him or her." 28

11   C.F.R. § 36.303(c)(2). "The type of auxiliary aid or service necessary to ensure effective

12   communication will vary in accordance with the method of communication used by the

13   individual; the nature, length, and complexity of the communication involved; and the

14   context in which the communication is taking place." 28 C.F.R. § 36.303(c)(1)(ii).

15           The DOJ has explained that the exchange of written notes is not appropriate "when

16   the matter involves more complexity, such as in communication of medical history or

17   diagnoses, in conversations about medical procedures and treatment decisions, or in

18   communication of instructions for care at home or elsewhere." *Silva v. Baptist Health S.

19   Fla., Inc.*, 856 F.3d 824, 837 n.8 (11th Cir. 2017) (citing 28 C.F.R. pt. 36 App'x A). An

20   entity violates the ADA when it fails to provide a reasonable accommodation unless the

21   entity can demonstrate that such accommodation would create an undue burden or

22   fundamentally alter the nature of the service being offered. 42 U.S.C. § 12182(b)(2)(A)(iii).

23   An "undue burden" is defined as "significant difficulty or expense." 28 C.F.R. § 36.104.

24           "A categorical refusal to provide ASL interpreters to deaf residents fails to make a

25   reasonable accommodation" and therefore violates the ADA.[4] *Fair Hous. Justice Ctr., Inc.*

26   ───────────────

     [4]Although this finding was made in the context of a Rehabilitation Act claim, "[t]he
27   standards used to determine whether an act of discrimination violated the Rehabilitation
     Act are the same standards applied under the Americans with Disabilities Act." *Coons v.
28   Sec'y of U.S. Dep't of Treasury*, 383 F.3d 879, 884 (9th Cir. 2004) (internal citations
     omitted); *see also Durand v. Fairview Health Servs.*, 902 F.3d 836, 841 (8th Cir. 2018)
     (case law interpreting the ADA and the Rehabilitation Act is generally used

*v. Allure Rehab. Servs. LLC*, No. 15CV6336RJDLB, 2017 WL 4297237, at *4 (E.D.N.Y. Sept. 26, 2017). "An outright refusal to provide an interpreter, as a matter of policy, demonstrates an unwillingness to engage with the needs of deaf persons." *Id.* However, there is no bright-line rule as to when an interpreter is necessary for effective communication or when, instead, "oral communication plus gestures and visual aids or note writing will achieve effective communication." *Bircoll v. Miami-Dade Cty.*, 480 F.3d 1072, 1087 (11th Cir. 2007). The standard to be applied is one of "meaningful access." *Alexander v. Choate*, 469 U.S. 287, 301 (1985) (interpreting the Rehabilitation Act to require "meaningful access" in the form of "reasonable accommodation" when necessary).

### ii.    Analysis

Both parties move for summary judgment on the ADA claim. Plaintiff argues that the Court should grant summary judgment on its ADA claim because it has shown that (1) Defendant is a place of public accommodation, and thus subject to the ADA's requirements; (2) Defendant failed to offer reasonable accommodations to deaf persons; (3) Defendant's offer of note-writing as a means of communication was not sufficient to comply with the ADA; and (4) Defendant categorically denied Plaintiff's request for a reasonable accommodation in the form of an ASL interpreter. (Doc. 47 at 3-8.)

Defendant argues that the Court should grant it summary judgment on the ADA claim because the evidence, in the form of communications that took place during the tour of the WG Campana facility, does not show that discrimination occurred. (Doc. 45 at 8-14.) Defendant argues that it complied with the requirement to afford reasonable and effective accommodations to deaf persons. (*Id.*) Defendant does not argue that providing ASL interpreters would unduly burden it. (*See* Doc. 47 at 8; Doc. 50.)

A question of fact exists as to whether Defendant's responses to Plaintiff's requests for an ASL interpreter constituted a denial of a full and equal opportunity to enjoy Defendant's services in violation of the ADA. Although Defendant's employees Ommegard and Guevara did not immediately assent to the testers' requests for ASL

interchangeably).

interpreters, it is also not clear that their responses were a "categorical denial" or an "outright refusal" to make a reasonable modification that would have provided the deaf individual with access in compliance with the ADA. Defendants' employees repeatedly offered written notes as an auxiliary aid or service and Plaintiff has not established facts showing that written notes would have been an ineffective auxiliary aid. Therefore, a question of fact remains as to whether written notes or other auxiliary aids other than an ASL interpreter would have provided effective communication. Furthermore, it is possible that Defendant would have agreed to provide an ASL interpreter had Plaintiff's testers indicated why communication in the form of written notes was not a reasonable modification that would have provided the grandmother full access to Defendant's services. (*See* Doc. 50 at 10.) Furthermore, Guevara indicated a willingness to continue to "work with" the deaf individual and her family regarding her communication needs. It is not clear from the record before the Court that Defendants denied meaningful access to the deaf individual. Thus, a genuine dispute of material fact exists as to whether Defendants' employees' communications to the testers constituted a denial, refusal, or failure to provide reasonable modifications that were necessary to provide the deaf individual with full and equal enjoyment, and Plaintiff's Motion for Summary Judgment on its ADA claim will be denied.

Likewise, Defendant's Motion for Summary Judgment on the ADA claims will be denied. Defendant asserts that Plaintiff "has no evidence of discrimination" (Doc. 45 at 8), but in fact, some of Defendant's employees' statements indicate at least unwillingness, and potentially refusal, to provide a reasonable accommodation to ensure effective communication. Defendant argues that Johnson's December 21, 2016 email message "does not specify any interaction between [WG] Campana and the deaf grandmother for which an ASL interpreter would be needed[.]" (Doc. 45 at 11.) However, the email message identified "group activities" and other "vital and important communications" as instances in which an ASL interpreter would, or could, be necessary. (*Id*.) Under the applicable regulations, Johnson's statements should have triggered Guevara, or another employee, to

at least attempt to "consult with [the individual] to determine what type of auxiliary aid" was necessary. (*See id*. at 13; 28 C.F.R. § 36.303(c)(1)(ii)). None of Defendant's employees did so. Defendant argues, again unconvincingly, that it had no opportunity to consult with the grandmother because she was fictitious. (Doc. 45 at 13.) Defendant ignores the evidence showing that WG Campana's employees never attempted to consult with the deaf individual, nor did they ask further questions of the testers to attempt to ascertain the extent of the deaf individual's communication needs. To the contrary, Guevara responded that the deaf individual's deafness "would not be an issue as long as she can jot down her needs." This statement could be interpreted as indicating that Defendant's position was that it would only be able to accommodate the deaf individual's communication needs if she could communicate through written notes.

Notably, Defendant's employees never stated or indicated to testers that Defendant *would* provide an ASL interpreter to the deaf individual were it necessary for her full and equal enjoyment of the WG Campana facility. In fact, Ommegard told tester Hasancevic that, to his knowledge, Atria's facilities do not, and have never, provided ASL interpreters for deaf residents. Ommegard told Hasancevic that the deaf individual would be responsible for procuring an ASL interpreter on her own, were one needed. Congress intended the ADA to address not just invidious or intentional discrimination based on disability, but also discrimination as a result of "thoughtlessness," "indifference," and "benign neglect." *Alexander*, 469 U.S. at 295. The record provides at least some evidence of this latter type. Accordingly, Defendant cannot establish that there is no genuine dispute of material fact as to whether it failed to make a necessary reasonable modification to ensure effective communication and equal enjoyment of its services.[5] The trier of fact will have to determine whether or not Defendant's responses to Plaintiff's requests for an ASL interpreter constituted a refusal or failure to provide reasonable modifications in violation

---

[5] Defendant cites multiple out-of-circuit cases to support its arguments that Plaintiff has failed to establish the elements of an ADA claim. (*See* Doc. 45 at 13-14.) These cases are not controlling in this District and Defendant has not cited a controlling case mandating summary judgment in its favor.

1    of the ADA. Accordingly, both Defendant's and Plaintiff's Motions for Summary

2    Judgment will be denied on the ADA claim.

3            **D.    FHA and AZFHA Claims**

4            The parties agree that the requirements of the FHA and the AZFHA are the same.

5    (Doc. 50 at 12, n.9 (citing Doc. 47 at 14, n.10)); *see also City of Tempe v. State*, 237 Ariz.

6    360, 364, 351 P.3d 367, 371 (Ct. App. 2015); 42 U.S.C. § 3601 *et seq.*

7                    **i.    Applicable Law**

8            Under the FHA, unlawful discrimination includes "a refusal to make reasonable

9    accommodations in rules, policies, practices, or services, when such accommodations may

10   be necessary to afford [a disabled] person equal opportunity to use and enjoy a dwelling."

11   42 U.S.C. § 3604(f)(3)(B). The Ninth Circuit has "repeatedly interpreted this language as

12   imposing an 'affirmative duty' on landlords and public agencies to reasonably

13   accommodate the needs of disabled individuals." *McGary v. City of Portland*, 386 F.3d

14   1259, 1261 (9th Cir. 2004). To prevail on a claim under 42 U.S.C. § 3604(f)(3), a plaintiff

15   must prove all of the following elements: "(1) that the plaintiff or his associate is

16   handicapped within the meaning of 42 U.S.C. § 3602(h); (2) that the defendant knew or

17   should reasonably be expected to know of the handicap; (3) that accommodation of the

18   handicap may be necessary to afford the handicapped person an equal opportunity to use

19   and enjoy the dwelling; (4) that the accommodation is reasonable; and (5) that defendant

20   refused to make the requested accommodation." *See* 42 U.S.C. § 3604(f)(3)(B); *Dubois v.*

21   *Ass'n of Apartment Owners of 2987 Kalakaua*, 453 F.3d 1175, 1179 (9th Cir. 2006) (listing

22   elements required to prevail on FHA claim); *see also United States v. California Mobile*

23   *Home Park Mgmt. Co.*, 107 F.3d 1374, 1380 (9th Cir. 1997) (listing prima facie elements

24   of FHA claim).

25           Reasonable accommodations on behalf of disabled persons "may be necessary to

26   afford such person equal opportunity to use and enjoy a dwelling." 42 U.S.C. §

27   3604(f)(3)(B). The FHA requires "reasonable accommodations necessary to meet the

28   disability-created needs of a disabled person, so that the disabled person may enjoy the

same [housing] opportunities enjoyed by nondisabled persons." *Giebeler v. M & B Assocs.*, 343 F.3d 1143, 1150 (9th Cir. 2003) (citing *U.S. Airways v. Barnett*, 535 U.S. 391 (2002)). The *Barnett* Court held that reasonable accommodations to achieve equal opportunity may require preferential treatment for disabled persons, because facially neutral policies or practices, even if not invidiously discriminatory, may result in treatment that denies disabled persons equal access and opportunity. *Id*. at 1150. The Seventh Circuit has held that "[w]hether the requested accommodation is necessary requires a "showing that the desired accommodation will affirmatively enhance a disabled plaintiff's quality of life by ameliorating the effects of the disability." *Dadian v. Vill. of Wilmette*, 269 F.3d 831, 838 (7th Cir. 2001) (internal citation omitted).

"Ordinarily, an accommodation is reasonable under the [FHA] when it imposes no fundamental alteration in the nature of the program or undue financial or administrative burdens." *Giebeler v. M & B Assocs.*, 343 F.3d 1143, 1157 (9th Cir. 2003) (internal citation and quotation omitted). "The question whether a particular accommodation is reasonable 'depends on the individual circumstances of each case' and 'requires a fact-specific, individualized analysis of the disabled individual's circumstances and the accommodations that might allow him to meet the program's standards.'" *Vinson v. Thomas*, 288 F.3d 1145, 1154 (9th Cir. 2002) (citing *Wong v. Regents of the Univ. of Cal.*, 192 F.3d 807, 818 (9th Cir.1999)). The plaintiff bears "the initial burden of producing evidence that a reasonable accommodation was possible." *Id*. Thereafter, the burden shifts to the defendant "to produce rebuttal evidence that the requested accommodation was not reasonable." *Id*.

The FHA requires a housing provider to engage in an interactive process with a tenant or resident with a disability. *Montano v. Bonnie Brae Convalescent Hosp., Inc.*, 79 F. Supp. 3d 1120, 1128 (C.D. Cal. 2015) ("Defendant's conduct, by failing to engage in the interactive process relating to the nature and scope of plaintiff's requested accommodations, also constitutes a violation of the FHA.") The *Montano* Court cites *Jankowski Lee & Assocs. v. Cisneros*, 91 F.3d 891, 895 (7th Cir. 1996), *as amended*, for the proposition that a housing provider who fails to engage in an interactive process in

order to determine the scope and nature of the requested accommodation violates the FHA. "If a landlord is skeptical of a tenant's alleged disability or the landlord's ability to provide an accommodation, it is incumbent upon the landlord to request documentation or open a dialogue." *Id.*

### ii.    Analysis

Both parties move for summary judgment on the FHA claims. Plaintiff argues that the Court should grant it summary judgment on the FHA claims because its request for an ASL interpreter was both reasonable and necessary, and Defendant failed to engage in an interactive process. (Doc. 47 at 15-16.) Defendant argues that the Court should grant it summary judgment on the FHA claims for the same reasons it sought summary judgment on the ADA claim, namely, that Plaintiff has not provided evidence of disability discrimination. (Doc. 45 at 8-14.)

As discussed above, the issues in contention include whether the requested accommodation of an ASL interpreter was (1) necessary; (2) reasonable, and (3) whether Defendant refused to make the requested accommodation. *Dubois*, 453 F.3d at 1179. Also in dispute is whether Defendant engaged in an interactive process to determine the scope and nature of the requested accommodation. *Montano*, 79 F. Supp. 3d at 1128. The record shows that neither Plaintiff nor Defendant has conclusively demonstrated material facts that would entitle them to summary judgment as a matter of law on the FHA claims.

As explained *supra* in Part IV(C), there remains a question of fact as to whether Defendant refused or denied the requested accommodation in violation of the FHA. Although Defendant's employees did not immediately assent to requests for an ASL interpreter, they also did not unequivocally deny Plaintiff an interpreter. There is also a question of fact as to whether an ASL interpreter was a "reasonable accommodation[] necessary to meet the disability-created needs of [the] disabled person, so that the disabled person may enjoy the same [housing] opportunities enjoyed by nondisabled persons." *Giebeler*, 343 F.3d at 1150. On the record before the Court, it is possible that another auxiliary aid such as note-writing—which was repeatedly offered by Defendants'

employee—would have permitted the deaf individual to enjoy WG Campana's housing services equally as a non-deaf individual. Applying the "fact-specific, individualized analysis of the disabled individual's circumstances and the accommodations" required by the Ninth Circuit, *Vinson*, 288 F.3d at 1154, the Court finds that a question of fact remains as to whether the accommodation of an ASL interpreter was reasonable or necessary.

Furthermore, a question of fact remains as to whether Defendant engaged in the interactive process required by the FHA. Although Ommegard's and Guevara's communications with Plaintiff's testers did not include follow-up questions regarding the nature of the deaf individual's disability or her needs, the record also reflects that Guevara attempted to contact Johnson by phone after receiving the December 21 email message. (*See* Doc. 50 at 13, Doc. 51 at ¶ 15.) Guevara was unable to reach Johnson by phone and Johnson did not return her calls. (*Id.*) The Court cannot conclude that Defendant failed to engage in the interactive process, as Defendant's attempts to engage in further conversation with Plaintiff's testers were unsuccessful due to Plaintiff's failure to engage—not Defendant's.

Likewise, Defendant also has not demonstrated that it is entitled to summary judgment. On the issue of the interactive process, the substance of each communication with Plaintiff's testers that is memorialized in the record indicates that Ommegard and Guevara failed to meaningfully follow up on Plaintiff's requests in order to ascertain the nature and extent of the individual's disability, the individual's needs, and how Defendant might accommodate her. Neither Ommegard nor Guevara asked a single question of Hasancevic or Johnson about their fictional deaf grandmother's needs or the nature of her disability, for example, whether she was deaf from early in her life or had become deaf later in life. Such questions would have permitted Defendant to ascertain whether an ASL interpreter might be a reasonable and necessary accommodation. Defendant has not shown that it engaged in the interactive process required by the FHA.

Furthermore, as discussed above in Section IV(C), some of Defendant's employees' statements to Plaintiff's testers indicate at least unwillingness, and potentially refusal, to

provide a reasonable accommodation. Ommegard's statements that "the communities typically don't" and "not that I've seen in any of the communities" could reasonably be interpreted to mean that Atria does not provide ASL interpreters at any of its communities or for any of its residents—a position that would violate the FHA. Further, Ommegard's agreement with the statement that the deaf individual would need to procure an ASL interpreter "on her own" could be interpreted to mean that WG Campana was unwilling to provide an ASL interpreter, regardless of whether that accommodation was necessary or reasonable. Moreover, Defendant's employees never stated or indicated to testers that Defendant *would* provide an ASL interpreter for their deaf grandmother, were it a necessary and reasonable accommodation for her while residing at WG Campana. The trier of fact will have to determine whether Defendant's responses to Plaintiff's requests for an ASL interpreter constituted a refusal or failure to provide a reasonable accommodation in violation of the FHA. Accordingly, both Defendant's and Plaintiff's Motions for Summary Judgment will be denied as to the FHA and AZFHA claims.

Accordingly,

**IT IS ORDERED**:

(1) Defendant's Motion for Summary Judgment (Doc. 45) is **granted in part and denied in part** as follows:

    a. Summary judgment is **denied** as to the issue of standing.

    b. Summary judgment is **granted** as to the Rehabilitation Act claim.

    c. Summary judgment is **granted** as to the Affordable Care Act claim.

    d. Summary judgment is **denied** as to the Americans with Disabilities Act claim.

    e. Summary judgment is **denied** as to the Fair Housing Act and Arizona Fair Housing Act claims.

. . . .

. . . .

. . . .

(2) Plaintiff's Motion for Summary Judgment (Doc. 47) is **granted as to the issue of standing**. Plaintiff's Motion for Summary Judgment is **otherwise denied**.

Dated this 1st day of February, 2021.

Honorable Rosemary Márquez
United States District Judge